**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>v.<br><br>BANK OF NOVA SCOTIA, NEW YORK AGENCY; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; BARCLAYS CAPITAL INC.; CANTOR FITZGERALD & CO.; CIBC WORLD MARKETS CORP.; CITIGROUP GLOBAL MARKETS INC.; COMMERZ MARKETS LLC; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; TD SECURITIES (USA) LLC; and UBS SECURITIES LLC,<br><br>      Defendants. | No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

PARTIES ........................................................................................................................ 6

  A.  Plaintiff .............................................................................................................. 6

  B.  Defendants ......................................................................................................... 6

JURISDICTION AND VENUE ..................................................................................... 11

CLASS ACTION ALLEGATIONS ............................................................................... 12

FACTUAL BACKGROUND ......................................................................................... 14

  A.  Treasury Securities ........................................................................................ 14

    1.  General Attributes ................................................................................... 14

    2.  Primary Dealers ...................................................................................... 17

    3.  The When-Issued Market & Treasury Auctions ...................................... 19

    4.  The Secondary Market ............................................................................ 24

  B.  Treasury Derivatives ...................................................................................... 26

  C.  Relationship Between Treasury Securities and Treasury Derivatives ............. 28

    1.  The Empirical Relationship ..................................................................... 28

    2.  The October 15, 2014 Event .................................................................... 30

  D.  The Lack of Regulation in the Treasuries Market ............................................ 31

  E.  The Treasuries Market is an "Insiders' Club" ................................................. 33

DEFENDANTS' UNLAWFUL CONDUCT ................................................................... 34

  A.  Defendants Are Horizontal Competitors in the Treasuries Market ................. 34

  B.  Defendants Conspired to Manipulate the Prices of Treasury Securities ......... 35

  C.  Defendants Conspired to Manipulate the Prices of Treasury Derivatives ...... 38

  D.  Plaintiff and the Class Were Injured as a Result of Defendants' Conduct .... 40

  E.  Government Investigations ............................................................................. 41

  F.  Defendants' Manipulation of the Other Financial Markets ............................. 41

    1.  LIBOR ..................................................................................................... 44

    2.  FX ........................................................................................................... 45

    3.  CDS ........................................................................................................ 46

    4.  ISDAFIX ................................................................................................ 46

    5.  GICs ....................................................................................................... 47

  G.  Defendants Fraudulently Concealed Their Collusive Manipulation of the
Treasuries Market .......................................................................................... 48

CLAIMS FOR RELIEF ................................................................................................. 51

PRAYER FOR RELIEF ................................................................................................ 56

JURY DEMAND .......................................................................................................... 57

Plaintiff Oklahoma Police Pension and Retirement System ("OPPRS" or "Plaintiff"), on behalf of itself and all others similarly situated, brings this action based upon personal knowledge as to its own acts and upon information and belief as to all other matters alleged herein, including the investigation of counsel and the work of a consulting expert. Plaintiff brings claims arising under the Sherman Act, Clayton Act, Commodity Exchange Act, and state common law seeking relief from the damages sustained as a result of the actions of Bank of Nova Scotia, New York Agency; BMO Capital Markets Corp.; BNP Paribas Securities Corp.; Barclays Capital Inc.; Cantor Fitzgerald & Co.; CIBC World Markets Corp.; Citigroup Global Markets Inc.; Commerz Markets LLC; Credit Suisse Securities (USA) LLC; Daiwa Capital Markets America Inc.; Deutsche Bank Securities Inc.; Goldman, Sachs & Co.; HSBC Securities (USA) Inc.; Jefferies LLC; J.P. Morgan Securities LLC; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Mizuho Securities USA Inc.; Morgan Stanley & Co. LLC; Nomura Securities International, Inc.; RBC Capital Markets, LLC; RBS Securities Inc.; SG Americas Securities, LLC; TD Securities (USA) LLC; And UBS Securities LLC's ("Defendants") and their collusive manipulation of the yields and pricing of U.S. Treasury bills, notes, and bonds (collectively, "Treasury Securities") as well as the prices paid for futures and options on Treasury Securities on the Chicago Mercantile Exchange ("CME") (collectively, "Treasury Derivatives" and with Treasury Securities, "Treasuries").

## **INTRODUCTION**

1.      This class action arises from Defendants' unlawful conspiracy to manipulate the price of certain financial instruments traded in or corresponding to securities issued by the U.S. Department of the Treasury (the "Treasury") for an eight-year period. Defendants' collusive manipulation of Treasuries occurred in non-transparent markets controlled by the Defendants and

facilitated, in large part, through oral and electronic communications between a closely-knit group of traders. This conspiracy bears a striking resemblance to admitted conspiracies whose punishments resulted in roughly $20 billion in government fines against the same Defendants or their affiliates for their collusion with respect to the London Interbank Offer Rate ("LIBOR"), foreign exchange ("FX"), credit default swaps ("CDS"), fixed interest swap rates ("ISDAFIX"), and municipal derivatives known as Guaranteed Investment Contracts ("GICs").

2.     Defendants' latest conspiracy first came to light in June 2015, when the U.S. Department of Justice ("DOJ") announced that it was investigating certain Defendants for manipulating the prices paid for Treasuries. Since that time, the New York Department of Financial Services ("NYDFS") has launched its own investigation into Defendants' manipulation of Treasury Securities and Derivatives. In early August 2015, NYDFS sent letters to nine banks, including Goldman Sachs, Deutsche Bank, and Barclays.

3.     Upon information and belief, Defendants conspired to manipulate the prices paid for Treasury Securities and Treasury Derivatives from as early as January 1, 2007 to the present (the "Class Period").

4.     The market for Treasury Securities and Treasury Derivatives (collectively, the "Treasuries Market") is the largest and most liquid government securities market in the world. At present, the U.S. Government, through the U.S. Department of Treasury (the "Treasury") has more than $12.6 trillion in Treasury Securities outstanding, $600 billion of which is bought and sold each day, with Defendants buying and selling more than $500 billion each day. Treasury Securities have had daily turnover as high as four million contracts per day. Because Treasury Securities are seen as free of default risk, Treasury Securities, like LIBOR and other interest rates, serve as benchmarks to price other assets. Assets that use Treasury Securities as a benchmark

include bonds, interest rate swaps, student loan debt, and Treasury Derivatives. In short, the reliability of the Treasury Securities market is critical to the stability and integrity of the U.S. financial system.

5.      Defendants have been authorized by the Treasury to act as "primary dealers" in Treasuries auctions, subject to specific terms and agreements with the U.S. government. As a result, they are the dominant players in the Treasuries market. Defendants purchase more than 70% of the Treasury Securities issued by the Treasury and then, within a week of their purchase from the Treasury, resell roughly 60% of these back to their customers, including Plaintiff and the Class. In this manner, Defendants act as "market makers" for Treasury Securities. As to Treasury Derivatives, Defendants carry, on average, net positions in the tens of billions of dollars.

6.      Treasury Securities are sold by the U.S. government in a regulated procedure that first began in 1929. Primary dealers, Defendants, and broker-dealers are the largest group of buyers in the auction process. The process begins by a public announcement released several days before an auction that identifies what Treasury Security is being sold, the amount, the auction date, the issue date, the maturity date, and the terms and conditions, which customers may participate, and competitive and non-competitive bidding close times.

7.      At Treasury auctions, broker-dealers, Defendants here, are required to submit sealed competitive bids for the Treasury Security being offered. No single broker dealer is permitted to buy more than 35% of the Treasury Securities available at the auction (to prevent market manipulation). The bids include both a quantity and a yield (*i.e.*, interest rate). The Treasury "accepts competitive bids in ascending order of their . . . yield . . . (lowest to highest) until the quantity of awarded bids reaches the offering amount. All bidders will receive the same rate, yield, or discount margin at the highest accepted bid." That is, the Treasury awards all

Treasury Securities at the lowest interest rate at which the entire series can be filled.

8.      As part of the registration as a primary dealer, Defendants agree to bid in every auction. They are required to bid no less than their pro rata share of the offering amount, which is calculated based on the number of primary dealers at the time of the auction. Primary dealers may bid on their own account – termed a "house bid" – or they may bid on behalf of other, indirect bidders.

9.      Transactions conducted between the announcement of an auction and the issuance of the securities occur in the "when-issued" market. Plaintiff and Defendants alike may participate in the when issued market, but Defendants participate primarily as sellers in this market. Thus, in general, Defendants act as sellers and Plaintiff and members of the Class act as buyers. The when-issued market closes when the auction, in which the Defendants attempt to buy Treasury Securities to cover their sales the when-issued market, occurs.[1] Defendants' profit on the difference between the prices at which Defendants sell Treasury Securities in the when-issued market and the price at which they buy the Treasury Securities at auction. This difference is known as the spread.

10.     With significant exposure in the Treasuries Market, Defendants manipulated the prices of Treasury Securities and Treasury Derivatives to minimize their risk and generate supra-competitive profits.

11.     First, following the announcement of an auction but before the auction began,

---

[1] As described in greater detail further herein, each of the Defendants was licensed by the Federal Reserve Bank of New York to act as a "primary dealer" in the auction process during the Class Period. This privileged position gave each Defendant the ability to attempt to increase the spread based on the information it learned in the when-issued market. Defendants, as explained herein, abused their privileged position and colluded with one another to ensure that the spread was artificially widened to the detriment of Plaintiff and the Class.

4

Defendants sold "short," meaning they sold Treasury Securities that they might not actually yet own, in the when-issued market. In order to minimize their risks and maximize their profits, Defendants colluded to drive down the yield of Treasury Securities sold in the when-issued market. Because yield is inversely related to price, Defendants' collusion drove up the price of the Treasury Securities they were selling in the when-issued market. Defendants then collusively submitted high-yield bids for the Treasury Securities they intended to purchase at the Treasury auction itself. Because yield is inversely related to price, Defendants thereby drove down the price of Treasury Securities at auction. In essence, Defendants were selling high and buying cheap.

12.     At the same time, Defendants were "spoofing" (*i.e.*, submitting fake bids and then cancelling them) Treasury Derivatives on the Chicago Mercantile Exchange ("CME"), the platform on which Treasury Derivatives are exchanged. Defendants' spoofing actions were aimed at manipulating the price of both Treasury Derivatives and Treasury Securities. This spoofing scheme was effective because the price of Treasury Derivatives, like the price of Treasury Securities, is inversely related to the yield such that by collusively spoofing Treasury Derivatives, the Defendants collusively manipulated the price for Treasury Securities. The inverse is also true: by manipulating the yields for Treasury Securities, Defendants were also able to move the price of Treasury Derivatives as they desired.

13.     Each of the aforementioned collusive strategies were specifically designed to manipulate the market for Treasuries Securities and the market for Treasury Derivatives.

14.     Defendants' spoofing also moved prices for Treasury Securities and helped Defendants' accomplish their collusive scheme.

15.     In short, Defendants used their influential position as primary dealers to

5

undermine the proper operation of the Treasuries Market. Through their unlawful conduct, Defendants maximized their own profits at the expense of Plaintiff and the Class.

16.     Plaintiff brings this action for damages, injunctive, and other necessary relief arising under the federal antitrust and commodities laws, as well as state law, for the substantial injuries it and all others similarly situated have sustained as a result of Defendants' unlawful conduct to restrain competition in the Treasuries Market during the Class Period.

**PARTIES**

**A.     Plaintiff**

17.     OPPRS purchased Treasury Securities directly from one or more of the Defendants. With assets in excess of $2 billion, OPPRS is a defined benefit pension plan that provides more than 8,500 active and retired members with retirement, death and disability benefits. OPPRS is based in Oklahoma City, Oklahoma and is overseen by a 13-member board of trustees.

**B.     Defendants**

18.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is the New York branch of a Canadian corporation with its principal place of business at 250 Vesey Street, New York, New York 10080. During the Class Period, BNS was a primary dealer of Treasury Securities.

19.     Defendant BMO Capital Markets Corp. ("BMO") is a Delaware corporation with its principal place of business at 3 Times Square, 28th Floor, New York, New York 10036. BMO operates as a subsidiary of BMO Financial Corp. During the Class Period, BMO was a primary dealer of Treasury Securities.

20.     Defendant BNP Paribas Securities Corp. ("BNP") is a Delaware corporation with

its principal place of business at 787 Seventh Avenue, New York, New York 10019. BNP operates as a subsidiary of BNP Paribas North America Inc. During the Class Period, BNP was a primary dealer of Treasury Securities.

21.     Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with its principal place of business at 745 Seventh Avenue, New York, New York 10019. Barclays operates as a subsidiary of Barclays Group US, Inc. During the Class Period, Barclays was a primary dealer of Treasury Securities.

22.     Defendant Cantor Fitzgerald & Co. ("Cantor") is a general partnership organized under the laws of New York with its principal place of business at 499 Park Avenue, New York, New York 10022. Cantor operates as a subsidiary of Cantor Fitzgerald LP. During the Class Period, Cantor was a primary dealer of Treasury Securities.

23.     Defendant CIBC World Markets Corp. ("CIBC") is a Delaware corporation with its principal place of business at 425 Lexington Ave, New York, New York 10017. During the Class Period, CIBC was a primary dealer of Treasury Securities.

24.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York corporation with its principal place of business at 390–388 Greenwich Street, New York, New York 10013. Citigroup operates as a subsidiary of Citigroup Financial Products Inc. During the Class Period, Citigroup was a primary dealer of Treasury Securities.

25.     Defendant Commerz Markets LLC ("Commerz"), formerly known as Dresdner Kleinwort Securities LLC, is a Delaware limited liability company with its principal place of business located at 2 World Financial Center, New York, New York 10281. During the Class Period, Commerz's predecessor-in-interest, Dresdner Kleinwort Securities LLC, was a primary dealer of Treasury Securities.

26.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware corporation with its principal place of business at 11 Madison Avenue, 24th Floor, New York, New York 10010. Credit Suisse operates as a subsidiary of Credit Suisse (USA), Inc. During the Class Period, Credit Suisse was a primary dealer of Treasury Securities.

27.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York corporation with its principal place of business at Financial Square, 32 Old Slip, New York, New York 10005. Daiwa operates as a subsidiary of Daiwa Capital Markets America Holdings Inc. During the Class Period, Daiwa was a primary dealer of Treasury Securities.

28.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a Delaware corporation with its principal place of business at 60 Wall Street, 4th Floor, New York, New York 10005. Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets Holding Corporation. During the Class Period, Deutsche Bank was a primary dealer of Treasury Securities.

29.     Defendant Goldman, Sachs & Co. ("Goldman") is a New York corporation with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282. Goldman operates as a subsidiary of The Goldman Sachs Group, Inc. During the Class Period, Goldman was a primary dealer of Treasury Securities.

30.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a Delaware corporation with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018. HSBC operates as a subsidiary of HSBC Investments (North America) Inc. During the Class Period, HSBC was a primary dealer of Treasury Securities.

31.     Defendant Jefferies LLC ("Jefferies") is a Delaware corporation with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022. Jefferies

operates as a subsidiary of Jefferies Group LLC. During the Class Period, Jeffries was a primary dealer of Treasury Securities.

32.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a Delaware corporation with its principal place of business at 277 Park Avenue, New York, New York 10172. JPMorgan operates as a subsidiary of JPMorgan Chase & Co. During the Class Period, JPMorgan was a primary dealer of Treasury Securities.

33.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a Delaware corporation with its principal place of business at One Bryant Park, New York, New York 10036. Merrill Lynch operates as a subsidiary of BAC North America Holding Company. During the Class Period, Merrill Lynch was a primary dealer of Treasury Securities.

34.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a Delaware corporation with its principal place of business at 320 Park Avenue, 12th Floor, New York, New York 10022. Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd. During the Class Period, Mizuho was a primary dealer of Treasury Securities.

35.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware corporation with its principal place of business at 1585 Broadway, New York, New York 10036. Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc. During the Class Period, Morgan Stanley was a primary dealer of Treasury Securities.

36.     Defendant Nomura Securities International, Inc. ("Nomura") is a New York corporation with its principal place of business at 309 West 49th Street, Worldwide Plaza, New York, New York 10019. Nomura operates as a subsidiary of Nomura Holding America, Inc. During the Class Period, Nomura was a primary dealer of Treasury Securities.

37.     Defendant RBC Capital Markets, LLC ("RBC") is a Minnesota limited liability

company with its principal place of business at Three World Financial Center, 200 Vesey Street, 5th Floor, New York, New York 10281. Prior to 2010, RBC was known as RBC Capital Markets Corp., which was also a Minnesota corporation headquartered in New York, New York. RBC operates as an indirect subsidiary of the Royal Bank of Canada. During the Class Period, RBC was a primary dealer of Treasury Securities.

38.      Defendant RBS Securities Inc. ("RBS") is a Delaware corporation with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901. RBS operates as a subsidiary of RBS Holdings USA Inc. During the Class Period, RBS was a primary dealer of Treasury Securities.

39.      Defendant SG Americas Securities, LLC ("Société Générale") is a Delaware corporation with its principal place of business at 1221 Avenue of the Americas, 6th Floor, New York, New York 10020. Société Générale operates as a subsidiary of SG Americas Securities Holdings, LLC, which itself is a subsidiary of Société Générale Group. During the Class Period, Société Générale was a primary dealer of Treasury Securities.

40.      Defendant TD Securities (USA) LLC ("TD Securities") is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York 10019. TD Securities operates as a subsidiary of TD Holdings II Inc. During the Class Period, TD was a primary dealer of Treasury Securities.

41.      Defendant UBS Securities LLC ("UBS") is a Delaware corporation with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901. UBS operates as a subsidiary of UBS Americas Inc. During the Class Period, UBS was a primary dealer of Treasury Securities.

42.      Other entities and individuals unknown to Plaintiff at this time, including other

major dealers of Treasury Securities, performed acts and made statements that aided and abetted and were in furtherance of and participated as co-conspirators in the unlawful conduct complained of herein.

## JURISDICTION AND VENUE

43.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26; Section 22 of the Commodity Exchange Act, 7 U.S.C. § 25; and 28 U.S.C. §§ 1331 and 1337(a).

44.     Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§ 15(a), 22, and 28 U.S.C. § 1391(b), (c), (d) because, during the Class Period, all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

45.     This Court has personal jurisdiction over each Defendant, because each Defendant transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy that affected commerce in the United States, including this District. Defendants' conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and Plaintiff's claims arise from Defendants' conduct.

46.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

## CLASS ACTION ALLEGATIONS

47.     Plaintiff brings this case pursuant to Federal Rule of Civil Procedure 23(b)(3) on

behalf of the below Class:

> All persons who, from January 1, 2007 to the present (inclusive), purchased Treasury Securities directly from a Defendant or who transacted in a Treasury Derivative on an exchange, where such persons were either domiciled in the United States or its territories, or, if domiciled outside the United States or its territories, purchased one or more Treasury Securities in the United States or its territories, or transacted in one or more Treasury Derivatives on a U.S. exchange.

48.     Specifically excluded from the Class are Defendants and their co-conspirators; the

officers, directors, or employees of any Defendant or co-conspirator; any entity in which any

Defendant or co-conspirator has a controlling interest; any affiliate, legal representative, heir, or

assign of any Defendant or co-conspirator, and any person acting on their behalf. Also excluded

from the Class are any judicial officers presiding over this action and the members of their

immediate family and judicial staff, and any juror assigned to this action.

49.     *Ascertainability.* Membership in the Class can be readily ascertained through

records of the Defendants.

50.     *Numerosity.* Plaintiff believes that there are thousands of Class Members, making

the Class so numerous and geographically dispersed that joinder of all Class Members is

impracticable.

51.     *Commonality.* There are questions of law and fact common to the Class that relate

to the existence of the conspiracy alleged and the type and common pattern of injury sustained as

a result thereof, including, but not limited to the following:

> a)     Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for Treasury Securities and/or Treasury Derivatives in violation

of the Sherman Act and/or Commodity Exchange Act;

b)      The identity of the participants in the conspiracy;

c)      The duration of the conspiracy;

d)      The nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e)      Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

f)      Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the Class Members;

g)      The appropriate injunctive and equitable relief for the Class; and

h)      The appropriate measure of damages sustained by Plaintiff and the Class Members.

52.    **Typicality.** Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and members of the Class sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

53.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of members of the Class. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent members of the Class. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust and commodities class action litigation.

54.    **Predominance.** Questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

55.    **Superiority.** A class action is superior to other available methods for the fair and

efficient adjudication of this controversy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, members of the Class, or the public record. Class treatment will also permit the adjudication of relatively small claims by many members of the Class who otherwise could not afford to litigate the claims alleged herein, including those for antitrust violations. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## FACTUAL BACKGROUND

### A.   Treasury Securities

#### 1.   General Attributes

56.    Treasury Securities, debt instruments issued by the U.S. government, are fundamental to the U.S. and global financial systems. They serve as benchmarks and as a conservative investment strategy, premised on the remote possibility that the United States will default on its commitments. As a result, Treasury Securities are one of the largest and most actively traded debt instruments in the world, with more than $12.6 trillion outstanding and $600 billion worth of Treasury Securities being bought and sold each day. Defendants are responsible for $500 billion of this daily turnover.

57.    Conservative investors, like pension funds and institutional investors servicing retirees' accounts, are drawn to investments in Treasury Securities as a safe and relatively risk-

free investment.

58.     There are three types of Treasury Securities at issue in this suit, the general attributes of each of which are set forth in the below table.

| TABLE 1 | | | |
|---|---|---|---|
| | **Treasury Bills ("T-Bills")** | **Treasury Notes ("T-Notes")** | **Treasury Bonds ("T-Bonds")** |
| **Denomination/Minimum** | $100/$10,000 | $100/$1,000 or $5,000[2] | $100/$1,000 |
| **Maturity Range** | 1 year or less | 2, 5, and 10 years | 10 years and longer |
| **Interest Payment Schedule** | Face Value at Maturity | Semi-Annual | Semi-Annual |
| **How Bought & Sold** | At a discount | Market sets price at par; discount on premium based on current yield | Market sets price at par; discount on premium based on current yield |
| **How Often Sold By Treasury** | 3 and 6 month T-Bills auctioned every Monday; one year T-Bills auctioned every three months | Two year T-Notes generally auctioned the third week of every month; five and yen year T-Notes auctioned every quarter | 30 year T-Bonds auctioned in February and August |
| **Approximate Percent of Outstanding Treasury Securities** | 15% | 72% | 13% |

59.     Treasury Securities are purchased by primary dealers, insurance companies, pension and retirement funds, investment funds, foreign accounts, nonprofit organizations, individual investors, and other national and international investors. The below table gives the approximate percentage and value (assuming $12.6 trillion outstanding) of Treasury Securities

---

[2] Minimum depends on maturity.

owned by the various categories of purchasers.

| TABLE 2 | | |
| --- | --- | --- |
| **Category of Purchaser** | **Approximate Ownership Percent** | **Approximate Value of Ownership (In Billions USD)** |
| Deposit Institutions | 3.4% | $428.4 |
| US Savings Bonds | 1.8% | $226.8 |
| Private Pension Funds | 4.5% | $567 |
| S&L Government Pensions Funds | 2.3% | $289.8 |
| Insurance Companies | 2.6% | $327.6 |
| Mutual Funds | 9.4% | $1,184 |
| State & Local Governments | 4.7% | $592.2 |
| Foreign Holdings | 56.6% | $7,131.6 |
| Other (Mostly Individuals) | 14.8% | $1,852.2 |
| **Total Privately Held** | **100%** | **$12,600** |

60.     Treasury Securities are used for investing and hedging purposes and as benchmarks for pricing other types of assets, including Treasury Derivatives. The U.S. Treasury market is the deepest and most-liquid government securities market in the world. It plays a critical and unique role in the global economy, serving as the primary means of financing the U.S. federal government, a significant investment instrument and hedging vehicle for global investors, a risk-free benchmark for other financial instruments, and an important market for the Federal Reserve's implementation of monetary policy.

61.     Over the past ten years, the amount of Treasury Securities outstanding has grown exponentially. The below table demonstrates this growth (in billions of dollars).[3]

---

[3] This chart excludes the amount outstanding of Treasury Inflation-Protected Securities ("TIPS"), as well as Floating Rates Notes ("FRNs"). The Treasury only began issuing FRNs in January 2014, and with TIPS, the principle amount of the security rises or falls based on whether there is inflation or deflation, with the holder being paid the adjusted principal or original principal, whichever is greater, upon maturity.

| TABLE 3 | | | | |
|---|---|---|---|---|
| Year | T-Bills | T-Notes | T-Bonds | Total |
| 2004 | $1,001.2 | $2,157.1 | $539.4 | $3,697.7 |
| 2005 | $960.7 | $2,360.2 | $516.4 | $3,837.3 |
| 2006 | $940.8 | $2,440.5 | $530.5 | $3,911.8 |
| 2007 | $999.5 | $2,487.4 | $558.4 | $4,045.3 |
| 2008 | $1,861.2 | $2,791.5 | $591.9 | $5,244.6 |
| 2009 | $1,793.5 | $4,181.1 | $717.9 | $6,692.5 |
| 2010 | $1,772.5 | $5,571.7 | $892.6 | $8,236.8 |
| 2011 | $1,520.5 | $6,605.1 | $1,064.1 | $9,189.7 |
| 2012 | $1,629.0 | $7,327.1 | $1,240.2 | $10,196.3 |
| 2013 | $1,592.0 | $7,881.7 | $1,408.2 | $10,881.9 |
| 2014 | $1,457.9 | $8,229.2 | $1,576.2 | $11,263.3 |

### 2.      Primary Dealers

62.      The Treasuries Market is dominated by primary dealers. These dealers are chosen by the Federal Reserve Bank of New York ("FRBNY") based upon their size, as well as their commitment and ability to purchase guaranteed amounts of the Treasury Securities auctioned. Primary dealers bid at auctions with the understanding that they will adhere to FRBNY guidelines, which are intended to promote the integrity of the auction process.

63.      Defendants are primary dealers. At present, the following entities are primary dealers: (1) Bank of Nova Scotia, New York Agency; (2) BMO Capital Markets Corp.; (3) BNP Paribas Securities Corp.; (4) Barclays Capital Inc.; (5) Cantor Fitzgerald & Co.; (6) Citigroup Global Markets Inc.; (7) Credit Suisse Securities (USA) LLC; (8) Daiwa Capital Markets America Inc.; (9) Deutsche Bank Securities Inc.; (10) Goldman, Sachs & Co.; (11) HSBC Securities (USA) Inc.; (12) Jefferies LLC; (13) J.P. Morgan Securities LLC; (14) Merrill Lynch, Pierce, Fenner & Smith Incorporated; (15) Mizuho Securities USA Inc.; (16) Morgan Stanley &

Co. LLC; (17) Nomura Securities International, Inc.; (18) RBC Capital Markets, LLC; (19) RBS

Securities Inc.; (20) SG Americas Securities, LLC; (21) TD Securities (USA) LLC; and (22) UBS

Securities LLC.

64.     Primary dealers' functions are established by the FRBNY. These functions are as

follows: "(i) participate consistently as counterparty to the [FRBNY] in its execution of open

market operations to carry out U.S. monetary policy pursuant to the direction of the Federal Open

Market Committee (FOMC); . . . (ii) provide the [FRBNY's] trading desk with market

information and analysis helpful in the formulation and implementation of monetary policy;" and

(iii) *participate in all auctions of U.S. government debt* and ***to make reasonable markets*** for the

[FRBNY] when it transacts on behalf of its foreign official account-holders."

65.     With regard to the auctions (described in greater detail below), the FRBNY

provides as follow: "Primary dealers should participate similarly in support of Treasury auctions:

the [FRBNY] will expect a primary dealer to bid in every auction, for, at a minimum, an amount

of securities representing its pro rata share, based on the number of primary dealers at the time of

the auction, of the offered amount. Its bid prices should be reasonable when compared to the

range of rates trading in the when-issued market, taking into account market volatility and other

risk factors."

66.     Partly because of the obvious dangers of the ability of primary dealers to dominate

the auctions, FRBNY announced certain "Business Standards," to which primary bidders are

supposed to adhere. These guidelines require, for example, that bid rates "be reasonable when

compared to the range of rates in the market." These guidelines are specifically referred to when

FRBNY is selecting primary dealers, and are a part of its "ongoing evaluation of a primary

dealer's performance against these expectations."

67.     In recent years, the number of primary dealers has shrunk. Specifically, between 1988 and 2010, the number of primary dealers contracted from 46 to 18 (currently, there are 22). "The most important reason for the decreasing number of dealers," according to the Treasury, "is consolidation, as Government security firms have merged or refocused their core lines of business."

### 3.     The When-Issued Market & Treasury Auctions

68.     The Treasury issues Treasury Securities through regularly-held public auctions to finance the debt of the U.S. Government. In 2014, the Treasury completed 270 public auctions and issued approximately $7 trillion in Treasury Securities.

69.     The below figure shows the frequency at which the Treasury holds auctions:

**FIGURE 1**

**U.S. Treasury Auction Schedule**

|  | Maturity | Auctioned |
|---|---|---|
| Cash Mgt Bills | Usually 1-7 Days | As Needed |
| Treasury Bills | 4-, 13- and 26-Week | Weekly |
| Treasury Bills | 52-Week | Monthly |
| Treasury Notes | 2-, 3-, 5- and 7-Year | Monthly |
| Treasury Notes | 10-Year | February, May, August & November with re-openings in other 8 months |
| Treasury Bonds | 30-Year | February, May, August & November with re-openings in other 8 months |
| Treasury Inflation Protected Securities (TIPS) | 5-Year | April with re-openings in August & December |
| Treasury Inflation Protected Securities (TIPS) | 10-Year | January & July with re-openings in March, May, September and November |
| Treasury Inflation Protected Securities (TIPS) | 3-Year | February with re-openings in June & October |

70.     The auctions have three phases: (1) announcement of the auction, (2) bidding, and

(3) issuance of the purchased Treasury Securities.

71.     Only primary dealers, primary dealers' customers (through the primary dealers), and direct bidders can take part in auctions, and Defendants can receive no more than 35% of the total amount of Treasury Securities available at any one auction. This rule is intended to prevent any single dealer from cornering the market.[4] However, as explained herein, Defendants subverted this process.

72.     The Treasury typically announces its auctions one week in advance. The announcement provides key details for the auction, including (a) the term and type of Treasury Security; (b) the total size of the offering; (c) the anticipated interest rate; and (d) the maximum amount that will be issued (directly or indirectly) to any single entity.

73.     Any time after announcement and before the auction closes, investors can submit competitive or non-competitive bids. Small investors who wish to take part in an auction generally submit non-competitive bids while large investors, including primary dealers such as Defendants, submit competitive bids through the Treasury Automated Auction Processing System ("TAAPS"). By law, both competitive and non-competitive bids must be sealed, that is, confidential.

74.     Non-competitive bids, which generally account for between 15-20% of the Treasury Securities auctioned, agree to accept the yield set at auction, which is determined with reference to the yields contained in the successful competitive bids. Non-competitive bids are

---

[4] Violation of this requirement famously subjected Salomon Smith Barney to investigations that ultimately led to its demise in 1992. A joint report issued by the Treasury, the Board of Governors of the Federal Reserve System, and the SEC, found that Salomon Brothers, Inc., had manipulated bids in at least five auctions. In each of those auctions, Salomon Brothers submitted false and/or unauthorized bids. Two of those false bids caused Salomon Brothers to violate the 35% cap. The markets for Treasury Securities have not been subjected to formal inquiry since that time.

capped at $5 million per auction per individual bidder.

75.     Primary dealers submit competitive bids and dominate the auction process, purchasing, on average, 70-80% of all Treasury Securities issued. In contrast to non-competitive bids, competitive bids specify the amount of Treasury Securities being auctioned that the bidder would like to purchase and the minimum yield (*i.e.*, interest rate), up to three decimal places, at which the dealer would be willing to purchase that quantity of Treasury Securities.

76.     Once the auction closes, TAAPS processes all bids to determine the yield. First, the non-competitive bids are subtracted from the offering amount to determine the amount of Treasury Securities available to competitive bidders. Because the Treasury aims to achieve the lowest costs for the U.S. government to finance its debt, TAAPS works its way down the list of competitive bids in ascending order—from lowest to highest yield—until the full offering amount has been awarded.

77.     Following completion of an auction, The Treasury publishes limited information about the results of the auction, including (a) the total amount of bids received, (b) the total amount of bids accepted, (c) the stop-out rate, and (d) whether the bidder with the stop-out rate received any proration. The Treasury does not release a specific list of accepted and rejected competitive bids.

78.     Shortly thereafter (usually within a few days after the close of the auction), the auctioned Treasury Securities are issued to the winning competitive bidders and non-competitive bidders. This process is done electronically, as Treasury Securities are held in "book-entry" form.

79.     While bids can be made at any point after an auction is announced and before the auction closes, most bids are not made until the latest possible point in time. This is because Defendants wait to submit bids until they have gathered information from the when-issued

market.

80.     First, by participating in the when-issued market, Defendants are able to gain a certain amount of "price discovery"; they are able to learn what their customers will pay for the yet-to-be-issued Treasury Securities. This information traditionally guides the bids that Defendants put in at the auction.

81.     Second, Defendants are buying and selling both on their own accounts and on the accounts of clients. The amount of Treasury Securities Defendants buy and sell in the when-issued market will determine their strategies in the auction. Defendants are typically net-sellers in the when-issued market, and as such, are generally "short" going into the auction; Defendants need to purchase Treasury Securities at auction to fulfill client orders. The more orders Defendants pledge to fulfill at a specified price, the greater the financial risk if the market moves against Defendants at the auction.

82.     The lack of transparency and consolidated control of these markets make them susceptible to manipulation. As came to light in the early 1990s, trading in the when-issued market has the tendency to facilitate rampant price-fixing and collusion:

> When the Treasury announces the details of an auction, dealers begin active trading in the "when-issued" market. Information from this market provides data on how strong the demand is for the securities being offered. . . . One way for a dealer to ensure that a bid is not too high is to collude with others on the actual bids that will be submitted. Sharing information from the when-issued market is permissible, but sharing confidential bidding information is illegal. When the auction deadline nears, the major dealers are in constant contact sharing information on expected demand from major clients, the amount they expect to bid, and the level of the market. Apparently, [this] collusion was facilitated by the existence of a number of former Salomon dealers who had gone to work for other firms. In theory, the exchange of information will tend to keep the price of the security down and the interest rate up.

83.     While the above quotation concerned the now-discontinued "English auction"

method, in which each winning primary dealer pays the price that the dealer bid, the motivations are still very much in play. Specifically, because Defendants, as primary dealers, are required to meaningfully participate in every Treasury Securities auction, Defendants' surest way of mitigating the risk of the price swinging against them is to illegally share confidential customer order and bid information and to band together to manipulate the prices at which they buy and sell Treasury Securities.

84.     The Treasury began moving away from the English-style auction after the above scandal, and since 1998, the Treasury has employed a "common value auction (or "Dutch auction") method. In this type of auction, the Treasury awards the Treasury Securities in any given auction at the yield of the last accepted competitive bid (the "stop-out" rate); all Treasury Securities issued in a single auction have the same rate.

85.     For example, assume the Treasury has auctioned $10 billion worth of 10 year T-Notes and received seven competitive bids for $13 billion, and non-competitive bids total $2 billion. The results of this auction are reflected in the below table.

| TABLE 4 | | | |
|---|---|---|---|
| **Bid #** | **Amount Bid** | **Yield Bid** | **Result** |
| 1 | $2 billion | 2.389% | Rejected |
| 2 | $3 billion | 2.388% | Rejected |
| 3 | $ 4 billion | 2.387% | $2 billion (50%) accepted at 2.387% |
| 4 | $ 2 billion | 2.386% | Accepted at 2.387% |
| 5 | $ 1 billion | 2.385% | Accepted at 2.387% |
| 6 | $ 2 billion | 2.384% | Accepted at 2.387% |
| 7 | $ 1 billion | 2.383% | Accepted at 2.387% |
| NC | $ 2 billion | Non-Competitive | Accepted at 2.387% |

86.     Auction theory posits that common value auctions, such as those for Treasury

Securities, are vulnerable to collusive price suppression. This is the case because each bidder has an incentive to avoid the "winner's curse," that is, the risk of overpaying for the asset and thereby losing money on its resale. By banding together and insuring that no entity puts in too high of a bid, each bidder can be assured that they will (a) win the auction and (b) avoid the winner's curse.

87.     This incentive to collude is exacerbated by the apparent approval of the FRBNY of the primary dealers' trading in the when-issued market ahead of each auction. Specifically, each bidder knows, for its transactions, the price at which it will be able to resell the Treasury Securities it purchases at auction. However, in a competitive market, Defendants do not have this information for the other primary dealers. This information asymmetry, according to auction theory, could allow a lucky or savvy primary dealer to profit at all of the others' expense. By sharing this information with one another, Defendants can avoid this information asymmetry risk and determine the optimal bid for all of them to win the auction at a price that avoids one of them winning at the expense of all others and for each of them to avoid the winner's curse.

### 4.     *The Secondary Market*

88.     The secondary market for Treasury Securities refers to the market in which Defendants (and other primary dealers) sell Treasury Securities purchased at auctions to other investors. Thus, purchasers in this market are direct purchasers for purposes of the antitrust laws.

89.     The secondary market for Treasury Securities includes the "on-the-run issues market," and the "off-the-run issues market." Once an auction is completed, the most recently issued T-Bill, T-Note, or T-Bond enters the "on-the-run issues market," ("ONTR") and the second-most-recently issued bill, note, or bond enters the "off-the-run issues market" ("OFTR"). In a competitive market, the ONTR market has a tighter spread than the OFTR market; this is known as the "on-the-run premium."

90.     Historically, trading in the secondary market has been either trades between primary dealers and their customers or trades between primary dealers. "Dealer-to-customer" trading refers to transactions between primary dealers and investors. "Dealer-to-dealer" trading, by comparison, is frequently accomplished on electronic platforms managed by brokers. Dealer-to-dealer trading has historically been concentrated in the ONTR market.

91.     Transactions in the secondary market are either done through voice or through electronic communication networks ("ECNs"). The vast majority of transactions in the ONTR issues market occur on ECNs, the largest of which belong to Tradeweb Markets LLC ("Tradeweb") and Bloomberg LP ("Bloomberg"). Defendants trade with large institutional clients, such as Plaintiff, on Bloomberg or Tradeweb's ECNs. On the Tradeweb and Bloomberg ECNs, the identity of the customer is disclosed to the bank. Tradeweb is owned by Defendants Bank of America, Barclays, Citi, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS, Thompson Reuters Corp., and UBS.

92.     In comparison, dealer-to-dealer trading in the when-issued and ONTR market is primarily done anonymously through ECNs. In the when-issued and ONTR markets, Defendants (and other broker-dealers) primarily use two inter-dealer brokers: BrokerTec (owned by ICAP Plc) and eSpeed (owned by Nasdaq OMX Group). Brokertec and eSpeed are responsible for 65% and 30% of when-issued volume, respectively. In addition to BrokerTec and eSpeed, Defendants also use Tradition, Tullet Prebon Plc, and BGC Partners, Inc. The prices offered on these dealer-to-dealer ECNs are better than those offered to institutional investors such as Plaintiff on Tradeweb and Bloomberg's ECNs.

93.     When using an ECN in the ONTR or OFTR market, the purchaser submits a Request for Quote ("RFQ"). The RFQ is for either a bid (looking to buy) or an offer (looking to

sell). However, even after receiving a bid or an offer, the transaction price must be confirmed; the bids and offer quotes are not "live."

94.     Defendants profit in the secondary market on the spread between the price at which they purchased the Treasury Securities at auction and the price at which they sell the Treasury Securities in the secondary market. As was true with their transactions in the when-issued market, the wider the spread, the more Defendants profit.

95.     Defendants are the predominant players in the secondary market, accounting for an average daily volume of $291 billion with customers and $220 billion with one another in the third quarter of 2006.

96.     Purchases and sales of Treasury Securities in the secondary market occur 24 hours per day. The vast majority – more than 90% - are placed or fulfilled from New York.

**B.    Treasury Derivatives**

97.     Treasury Derivatives are futures and options on Treasury Securities traded on the CME.[5] Futures are instruments that obligate the buyer or seller to buy or sell Treasury Securities at a predetermined future date and price. Options are instruments that give the holder the right to enter into a specified futures contract with respect to Treasury Securities.

98.     There are at least eleven types of Treasury Derivatives, which are set forth in the below table.

---

[5] Treasury Derivatives were first introduced by the Chicago Board of Trade ("CBOT") in 1977. CBOT merged with CME in July 2007 and now operates as a unit under the control of CME. Thus, for at least several months of the Class Period, Treasury Derivatives were purchased on CBOT.

| TABLE 5 | | |
|---|---|---|
| **Treasury Derivative** | **Contract Size** | **Tick Size** |
| 2-Year T-Note Futures | 1 T-Note @ $200,000 | 1/4 of 1/32 ($15.625 rounded up to the nearest cent per contract). |
| 3-Year T-Note Futures | 1 T-Note @ $200,000 | 1/4 of 1/32 ($15.625 rounded up to the nearest cent per contract) |
| 2-Year T-Note Options | 1 2-Year T-Note Futures Contract | One-half of 1/64 of a point ($15.625 rounded up to the nearest cent per contract) |
| 5-Year T-Note Futures | 1 T-Note @ $100,000 | 1/4 of 1/32 ($7.8125 rounded up to the nearest cent per contract) including inter-month spreads |
| 10-Year T-Note Futures | 1 T-Note @ $100,000 | 1/2 of 1/32 ($15.625 rounded up to the nearest cent per contract) except for inter-month spreads, where the minimum price fluctuation shall be 1/4 of 1/32 ($7.8125 rounded up to the nearest cent per contract) |
| 5-Year T-Note Options | 1 5-Year T-Note Futures Contract | 1/2 of 1/64 of a point ($7.8125 rounded up to the nearest cent per contract) |
| 10-Year T-Note Options | 1 10-Year T-Bond Futures Contract | 1/64 of a point ($15.625 rounded up to the nearest cent per contract) |
| T-Bond Futures | 1 T-Bond @ $100,000 | Points ($1,000) and 1/32 of a point. |
| Ultra T-Bond Futures | 1 T-Bond @ $100,000 | Points ($1,000) and 1/32 of a point. |
| T-Bond Options | 1 T-Bond Futures Contract | 1/64 of a point ($15.625 rounded up to the nearest cent per contract) |
| Ultra T-Bond Options | 1 Ultra T-Bond Futures Contract | 1/64 of a point ($15.625 rounded up to the nearest cent per contract) |

99.     Futures contracts run for the first five consecutive contracts in the March, June, September and December quarterly cycle whereas options contracts are listed for the first three consecutive contract months (two serial expirations and one quarterly expiration) plus the next four months in the March, June, September, and December quarterly cycle.

100.    The average daily volume of Treasury Derivatives has reached as high as 4.1 million contracts per day. The popularity of Treasury Derivatives is set forth in the below figure.

27

**FIGURE 2**

**Treasury Futures Avg Daily Volume**

[bar chart showing Treasury Futures Avg Daily Volume from 2000 to 2012, with values ranging from about 500,000 to 2,700,000; categories: Ultra, 30-Year, 10-Year, 5-Year, 2-Year]

101.    In terms of value, trading in Treasury Derivatives on the CME reached roughly $79.6 trillion (notional) in 2013.

102.    Many of the same entities that purchase Treasury Securities also purchase Treasury Derivatives: asset managers, Defendants, other banks, corporations, hedge funds, insurance companies, mortgage bankers, pension funds, and proprietary traders.

103.    While publicly available information on primary dealer's positions in Treasury Derivatives is limited, studies have found that primary dealers, such as Defendants, make significant investments in Treasury Derivatives to, in part, hedge the risk associated with acquiring 70-80% of all Treasury Securities auctioned.

**C.    Relationship Between Treasury Securities and Treasury Derivatives**

   ***1.    The Empirical Relationship***

104.    In general, the value of Treasury Securities can be calculated by assessing these factors: their par value; their coupon; and the yield for those securities, taken in consideration

with the demand. "Par value" or "face value" is the listed price of the security. A security's coupon is its interest rate, which the debt issuer agrees to provide to the buyer. In terms of nomenclature, a coupon is expressed as a percentage of a security's par value. If interest rates are higher, then coupon rates will augment par value.

105.    The coupon rates plus the face or par value subtracted from the purchase, divided by the years to maturity, divided by face value plus purchase price divided by two, is a commonly accepted way to calculate yield. As one can see, then, if the yield of Treasury Securities increases, their price decreases. Similarly, if the yield decreases, the price increases.

106.    To demonstrate the correlation, assume an investor purchases a T-Bond for par value at 3% but at the next auction T-Bonds sell for 3.5% at par value. The investor now wishes to sell the T-Bond with the 3% yield, but no one in the market is willing to pay par for that product because T-Bonds of the same par value are available at a higher yield. This being the case, the investor needs to sell the 3% T-Bond at a "discount to par." If the inverse occurs (*i.e.*, the T-Bond rate moves to 2.5%), the investor has a more valuable asset and can sell his 3% T-Bond at a "premium to par."

107.    The same inverse relationship exists for Treasury Derivatives as well: as yields decrease, prices for futures increases, and vice-versa. This is demonstrated in the below figure.

**FIGURE 3**



108.     Treasury Derivatives are settled through physical delivery (as opposed to cash settlement). However, the seller of a Treasury Derivative can provide the buyer with any Treasury Security that meets the contract specification; outside of the Treasury Security type, a specific Treasury Security issue is not specified. Thus, the seller of a T-Bond Future, could, at settlement, deliver a T-Bond of any maturity. This permits the seller of the Treasury Derivative to deliver the Treasury Derivative that is most profitable to his position.

109.     This being the case, Treasury Derivative prices utilize a conversion system so as to account for all of the Treasury Securities that could be delivered at settlement.

110.     At settlement, the seller will deliver to the buyer the Treasury Security that is the cheapest for him to deliver (the "cheapest-to-deliver," or "CTD" Treasury Security). The Treasury Derivative price will therefore closely track that price of the corresponding CTD Treasury Security.

111.     Thus, Defendants' collusive manipulation of the yields (and thereby prices) for Treasury Securities necessarily and directly impacted the prices for Treasury Derivatives.

### 2.      The October 15, 2014 Event

112.     The interconnected relationship between Treasury Securities and Treasury Derivatives is perhaps best demonstrated by the events of October 15, 2014, when the market for Treasury Securities and Treasury Derivatives "experience[d] an unusually high level of volatility and a very rapid round-trip in prices." Unlike past periods of extreme volatility, which were accompanied by major policy announcements, no such announcement was made on that day. As explained in greater detail below, Plaintiff alleges that Defendants, together with unnamed co-conspirators, were responsible for the events of October 15, 2014.

113.     At roughly 8:30 am on October 14, economic data was released that was less

robust than expected, and interest rates declined. At just after 9:30 am, with no new announcements, yields again, seemingly inexplicably, declined sharply. Yields continued to decline dramatically until roughly 9:39 am, at which points yields "abruptly reversed course and nearly retraced . . . again with no apparent trigger" until 9:45 am. The fifteen minute trading window between 9:30 and 9:45 has been referred to as the "October 15 Event Window." In terms of hard numbers, between roughly 9:30 and 9:39, the yield on a 10-year T-Note fell from 2.02% to 1.86%, and from roughly 9:39 to 9:45, the yield increased to 1.99%.

114.    The dramatic swing in prices of Treasury Securities was accompanied by closely related volatility in the price of corresponding Treasury Derivatives. Despite this unexpected and significant price movement, "[n]o trades executed on the interdealer cash and futures platforms analyzed were broken or adjusted, nor was price 'gapping – or significant jumps from one price point to another with no transaction in between" observed on October 15. Put simply, even in the most volatile of markets in which prices were moving with no apparent economic basis, the prices for Treasury Securities and Treasury Derivatives remained in sync.

## D.    **The Lack of Regulation in the Treasuries Market**

115.    Despite its size and the huge influence the Treasuries Market has on the U.S. and global economy, it is only lightly regulated.

116.    While various financial regulators oversee small parts of the market, no single entity regulates the entire market. Specifically, the Treasury makes rules to regulate Treasury Securities, but it lacks the authority to enforce the rules it prescribes; the Securities and Exchange Commission ("SEC") can enforce the Treasury rules, but it can only do so when it is alerted to unusual trading behavior; and the FRBNY monitors the purchase and sale of Treasury Securities, but only in relation to its decisions on monetary and fiscal stability policy.

117.    In 1992, the Inter-Agency Working Group for Treasury Market Surveillance ("IAWG") was formed. Consisting of members of the Board of Governors of the Federal Reserve System, Treasury, FRBNY, CFTC, and SEC, the IAWG is charged with improving "monitoring and surveillance and strengthen interagency coordination with respect to U.S. Treasury markets."

118.    The FRBNY also sponsors a Treasury Market Practices Group ("TMPG"), a working group of Treasury Securities primary dealers that includes representatives from several Defendants, including Thomas Wipf of Morgan Stanley, Jim Hraska of Barclays, James DeMare of Merrill Lynch, Mark Tsesarsky of Citigroup, Sandra O'Connor of JPMorgan, and Beth Hammack of Goldman. These individuals meet at various times with representatives of the FRBNY and The Treasury to discuss issues affecting the Treasuries market.

119.    The TMPG periodically publishes best practices and antitrust guidelines on acceptable and unacceptable behavior in the Treasuries market. Among the behaviors deemed unacceptable are price fixing agreements, sharing of pricing information, allocation of customers, and boycotts. Although the TMPG issues best practices, compliance, and ethical guidelines, it lacks any enforcement power with respect to its members' activities.

120.    Ironically, although Defendants and other primary dealers are subject to the Treasury and the FRBNY's rules, neither entity has enforcement power with respect to Treasury Derivatives. Rather, the U.S. Commodity Futures Trading Commission ("CFTC") is responsible for monitoring the market for Treasury Derivatives under the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1, *et seq.* The CFTC does not monitor the primary Treasury Securities market.

121.    This limited regulation of the Treasuries Market, the widely-dispersed authority to enforce the regulations that do exist, the Treasuries Market's massive size, and the fact that

only a handful of Defendants' traders are responsible for the purchase and sale of Treasury Securities and Treasury Derivatives all render the Treasuries Market highly susceptible to collusion. Defendants and other primary dealers hold a central and privileged role in the proper and efficient operation of the Treasury Securities auctions, the secondary Treasury Securities market, and the Treasury Derivatives market. Defendants used (and continue to use) their special position as primary dealers to manipulate the Treasuries Market to their benefit and to the detriment of others, including Plaintiff and Class Members.

**E.      The Treasuries Market is an "Insiders' Club"**

122.     In spite of its massive size and importance to the U.S. and global economies, the Treasuries Market is controlled by a handful of closely-knit, influential traders at each of the primary dealers. Indeed, one commentator has noted that the Treasuries market "is a fertile area for harmful collusive behavior."

123.     Many of the Treasuries traders employed by Defendants have shared common employers in the past in which they developed close relationships. For instance, Glenn Hadden was formerly employed as the head of government bond trading at Goldman Sachs. An investigation by CME into alleged manipulation of prices paid for Treasury Derivatives while he was employed at Goldman Sachs in 2008 led to CME imposing a ten-day suspension and an $80,000 fine on Hadden and an $875,000 fine on Goldman Sachs. It was also reported that FRBNY had suspected Hadden of manipulating the prices for Treasury Securities at auction. In response to the CME probe, Goldman Sachs placed Hadden on paid leave for roughly one year, after which point he left Goldman Sachs and joined Defendant Morgan Stanley as its head of interest rates trading. This move corresponded with a significant drop in Goldman Sach's revenues from interest rate trading and a corresponding rise in Morgan Stanley's revenues from

interest rate trading.

124.    While many banks have rules prohibiting their traders from discussing client orders or anticipated yields before auctions, the traders frequently share this information with one another and with clients. Traders are able to do this with impunity because internal guidance on sharing of this information is not followed, not monitored, and/or not enforced.

125.    For instance, internal sources at Defendants BNP and Cantor Fitzgerald informed Bloomberg that there is no consistent understanding among traders at those institutions about whether they can share confidential client information and anticipated yield bids prior to auctions. Similarly, Bloomberg reported that Defendant Cantor Fitzgerald's Treasury traders operate "on an honor system."

126.    Similarly, according to a bank insider, traders at Defendant Société Générale receive pre-auction information of customers' orders and interest.

## DEFENDANTS' UNLAWFUL CONDUCT

**A.**    **Defendants Are Horizontal Competitors in the Treasuries Market**

127.    Throughout the Class Period, Defendants have been horizontal competitors in the Treasuries Market, and in particular, for Treasury Securities and Treasury Derivatives

128.    In the Treasuries Market, Defendants compete with each other in three ways: (1) as primary dealers bidding on behalf of their clients and on their own behalf in auctions for Treasury Securities; (2) as market makers in the secondary market for Treasury Securities; and (3) as traders for their own accounts in Treasury Derivatives.

129.    Absent collusion, Defendants would individually make lower yield bids for Treasury Securities purchased at auctions (*i.e.*, purchase at the highest price from the Treasury). The reduction of competition between Defendants also reduced efficiency in Treasury Securities

auctions, in the secondary market for Treasury Securities, and in the Treasury Derivatives market.

130.     During the Class Period, Defendants manipulated the when-issued market and Treasury Securities auctions to reap supra-competitive profits for Treasury Securities.

131.     Defendants' collusive and coordinated activities had adverse consequences on competition and created artificial and manipulated markets.

132.     As alleged herein, Defendants' conduct injured competition and the interplay of supply and demand for Treasury Securities. Defendants' collusive manipulation of the Treasuries Market had an immediate, direct, substantially certain, and foreseeable impact on the prices of Treasury Securities at auction and in the secondary market, as well as in the corresponding market for Treasury Derivatives.

**B.      Defendants Conspired to Manipulate the Prices of Treasury Securities**

133.     Throughout the Class Period, Defendants abused their position as primary dealers in the Treasury Securities market.

134.     Defendants, as primary dealers, have a unique informational advantage in both the Treasury Securities auctions and the when-issued market, allowing them to assess and anticipate prices in the Treasury Securities market.

135.     Defendants were able to accomplish this, through, in part, the lack of oversight of the Treasuries Market. According to *Bloomberg*, it has been nearly two decades since "regulators took a hard look at how Wall Street trades Treasuries." And as outlined above, there is a hodgepodge of agencies responsible for overseeing this market, but none that do much regulating.

136.     However, Defendants unlawfully conspired in sharing this information, and in particular, customer order flow information and the yields to be bid at auction, to collusively manipulate the prices of Treasury Securities sold in the when-issued market and purchased at

auction.

137.   In particular, government regulators and industry insiders have noted as follows:

a)   According to the CFTC, "[I]n the minutes leading up to 11:00 a.m., a Barclays options trader emailed traders on Barclays' U.S. Treasuries desk: 'I have an exercise at 11am this morning, I will need to sell 635 5s, but I want to push the screens down at 11, as much as . . . you can, so that I can get a better 11 am print."

b)   According to industry insiders, it is an "open secret" that Treasury securities traders employed by Defendants "can see orders flowing in."

c)   According to Mark MacQueen, a manager for Sage Advisory Services Ltd., "[P]rimary dealers are an insiders' club where they're supposed to have more information."

d)   According to traders interviewed by *Bloomberg*, "bankers have often shared broad guidance, both internally and to clients, on whether demand is slack or strong before auctions."

138.   Further, while many banks have rules prohibiting employees from discussing yields or the size of client bids before auction, "[i]n many cases, such guidelines aren't always followed, monitored or enforced." For instance, at BNP and Cantor Fitzgerald, there is not a "consistent understanding among traders and salespeople about whether they can share information about orders before [Treasury] auctions." Similarly, "[a]ccording to a person familiar with Société Générale's operations (the parent for Defendant Société Générale), Treasury securities "traders can get a preauction rundown of customers' level of interest."

139.   And despite TMPG guidelines advising them not to, Defendants often shared proprietary information about customer orders and yields to be bid at Treasury auctions. Interviews with traders at primary dealers confirm that they frequently "talked with counterparts at other banks via online chatrooms" and "swapped gossip about clients' Treasury orders."

140.   The information asymmetry between primary dealers and other market participants gives primary dealers a unique informational advantage in both Treasury auctions

and the when-issued market, allowing them the ability to assess and anticipate their own exposure and predict price movements in the market for Treasury Securities.

141.    The exchange of this proprietary customer information allowed Defendants to coordinate bid-ask spreads and artificially inflate the prices for Treasury Securities in the secondary market.

142.    Through this conspiracy, Defendants artificially increased the spread between prices of Treasury Securities in the secondary market and at auction and, thereby, increased their own profits. In addition, through their conspiracy, Defendants also manipulated the prices of Treasury Derivatives and thereby increased their own profits.

143.    Defendants' gaming of the market was enhanced through the use of electronic transmissions. Allegations have surfaced that certain parties were submitting fake bids and then cancelling them (called "spoofing") to move the market, enabling Defendants to submit bids in their house accounts to their benefit. This front running was accomplished by improperly betting against trades they knew were coming in, using the confidential trading information provided to Defendants in their roles as primary dealers. These activities were plainly in contravention of auction rules.

144.    Defendants' spoofing activities were on display during the October 15 Event Window. As the Joint Report noted, "[a]nalysis of transaction and order book data during the event window revealed two notable patters in activity . . . high levels of cancellations and self-trading . . . ."

145.    Expert economic analysis of data in the Treasuries Market, and in particular trends in the "auction tail" for T-Notes between 2003 and 2014, supports Plaintiff's allegations of collusion. By analyzing the last accepted bid (the "stop yield") with the median bid, an

economic expert can assess demand. The stop-out yield is the last price at which an auction for a particular Treasury Security is awarded – that is, the lowest price in that auction. The median yield of the bids is the midpoint, but not the average. The auction tail is the difference between the stop-out yield and the median yield of the bids accepted at the auction. The auction tail provides an indication of demand: typically, the larger the tail, the weaker the demand. The import of this ratio, in this context, is not as a predictor of demand, but as a baseline to test deviations in the market over time.

146.    In fact, when tested, these trends were consistent with collusion by Defendants to suppress auction prices before each auction. Specifically, from 2003 through 2014, expert analysis has noted a sharp increase in the auction tail for 5-year T-Notes, which could indicate weaker demand, as one would expect when the lowest best price exceeds the median price.

147.    After examining other measurements of demand and other possible reasons for a decline in demand during this period, and excluding them from mathematical analysis, our experts have concluded that these other measurements and factors likely could not have accounted entirely for the sharp increase in the auction tail. That is, mathematical analysis ruled out non-collusive explanations for this increase in the auction tail.

## C.    Defendants Conspired to Manipulate the Prices of Treasury Derivatives

148.    The prices of Treasury Securities in the when-issued market and at auction have a direct and positive correlation with the prices of Treasury Derivatives. Defendants' manipulation of Treasury Securities in the when-issued market and at auction had a direct effect on the price of Treasury Derivatives, proximately causing those prices to increase.

149.    As with the transactions in Treasury Securities, Defendants' manipulation of the prices for Treasury Derivatives was accomplished through spoofing. By placing fake bids,

Defendants could move the market, and place bids where they believed the actual market to be. In these fractions of a second, Defendants earned significant profits by exploiting the market movements on the CME.

150.   Because of the interconnected relationship between the prices for Treasury Securities and Treasury Derivatives, these fake transactions impacted prices for Treasury Securities and Treasury Derivatives. Specifically, Defendants spoofed false buy orders on ECNs to drive up the price on the Treasury Securities currently trading in the when-issued market; as the price of the Treasury Derivative being spoofed increased, the Treasury Security trading in the when-issued market also increased. Defendants then capitalized on the increased spread, as noted above.

151.   Defendants' spoofing activities have also been confirmed by the FBI. In a Federal Bureau of Investigation ("FBI") interview report of Ms. Jennifer Shaw submitted to the U.S. District Court for the Northern District of Illinois, the FBI noted that Shaw, who was employed by an HFT firm located in Chicago, "observed that a T-Bond market participant was engaged in 'pretty obvious' spoofing behavior" on the CME market for 10 and 30 year T-Bonds in the October 2011 time frame. Shaw remarked:

> The market participant placed several levels of large orders, usually two or three, on the bid or offer side of the market, at or near the best bid or offer. These orders were short lived and were cancelled by the market participant within a brief period of time. These short-lived orders were quite large for the T-Bond market. This happened repeatedly on both sides of the market during the trading day and it triggered . . . trading algorithms, which looked at the size and price of the orders entered into the T-Bond market, among other factors.

152.   Shaw told the FBI that "she has seen spoofing on other occasions and it has grown more sophisticated" since October 2011.

153.   As a result of their collusive manipulation of the Treasuries Market, Defendants

maximized their own profits at the expense of purchasers of Treasury Securities and Treasury Derivatives.

**D.    Plaintiff and the Class Were Injured as a Result of Defendants' Conduct**

154.    Defendants, as primary dealers participating in Treasury Securities auctions, were in a unique position to artificially influence the purchase prices and yields of Treasury Securities. Defendants abused their unique position by unlawfully manipulating the prices paid for Treasury Securities at auction and in the secondary market, thereby preventing the normal competitive auction process.

155.    Defendants also abused their unique position with regards to Treasury Securities by collusively manipulating the prices for Treasury Derivatives, thereby depriving Treasury Derivatives traders from benefiting from the CME's normal competitive pricing process.

156.    Defendants specifically intended to, and did, cause unlawful and artificial manipulation of prices for Treasury Securities and Treasury Derivatives. As active and sophisticated primary dealers, Defendants understood and knew to a substantial certainty that their manipulation of auction prices for U.S. Treasury Securities would have a direct corresponding effect on prices for Treasury Securities in the secondary market and Treasury Derivatives on the CME, and would cause actual damages to Plaintiff and members of the Class. As a result of their unlawful conduct, Defendants reaped artificial and anticompetitive gains to the detriment of Plaintiff and members of the Class.

157.    The consequences of Defendants' conduct were foreseeable and Defendants knowingly, intentionally, and recklessly caused such harm and injury to Plaintiff and members of the Class.

158.    Defendants' manipulation of the Treasuries Market caused injury to Plaintiff and

members of the Class who transacted in Treasury Securities or Treasury Derivatives during the Class Period. Plaintiff and members of the Class were harmed each time they purchased products in the Treasuries Market. The injuries to Plaintiff and Class members flow directly from Defendants' anticompetitive conduct to manipulate the Treasuries Market.

159.    The injuries suffered by Plaintiff and members of the Class are of the type antitrust laws were designed to prevent.

**E.    Government Investigations**

160.    Defendants' conspiracy to manipulate the Treasuries Market first came to light in June 2015, when the DOJ announced that it was investigating at least three of the twenty-two Defendants for manipulating the price Treasury Securities.

161.    Shortly thereafter, in August 2015, it was announced that NYDFS had launched its own investigation into conspiratorial misconduct in the Treasuries Market, sending letters to nine banks, including Goldman Sachs, Deutsche Bank, and Barclays.

162.    A follow-on grand jury has been convened in the Northern District of Illinois to investigate Defendants' spoofing of Treasury Derivatives on the CME.

**F.    Defendants' Manipulation of the Other Financial Markets**

163.    Defendants' conduct in this case is part of a larger set of revelations emerging about Defendants' collusive manipulation of other financial benchmarks and the prices of financial instruments tied to those benchmarks. Indeed, some of the same Defendants in this suit have pled guilty to violating the antitrust laws in other financial markets.

164.    In each of these financial market manipulation cases, the Defendants, including some of the same Defendants here, employed the same means to accomplish their collusive manipulation (*i.e.*, electronic chats, e-mails, and other communications) and the manipulated

markets contain many of the same attributes (*i.e.*, non-transparent markets with little regulatory oversight controlled by a handful of influential, friendly traders at the various banks). The manipulation of the Treasuries Market contains these vary same attributes.

165.    In particular, the Treasuries Market investigation comes on the heels of government investigations into certain Defendants, or their parents and affiliates, for their roles in collusively manipulating LIBOR, FX, CDS, ISDAFIX, and GICs. The targets of the various worldwide government investigations are set forth in the below table.

| TABLE 6 | | | | | |
|---|---|---|---|---|---|
| **Bank Family** | **LIBOR** | **FX** | **CDS** | **ISDAFIX** | **GICs** |
| Bank of America | X | X | X | X | X |
| Barclays | X | X | X | X | |
| BNP Paribas | X | X | X | X | |
| Citi | X | X | X | X | |
| Credit Suisse | X | X | X | X | |
| Deutsche Bank | X | X | X | X | |
| Goldman Sachs | | X | X | X | |
| HSBC | X | X | X | X | |
| J.P. Morgan | X | X | X | X | X |
| Morgan Stanley | | X | X | X | X |
| Nomura | X | X | | X | |
| Société Générale | X | X | | | X |
| Rabobank | X | X | | | |
| RBC | X | X | | | |
| RBS | X | X | X | X | |
| UBS | X | X | X | X | X |

166.    To date, the LIBOR, FX, ISDAFIX, and GICs investigations have resulted in ***worldwide government fines of roughly $20 billion*** against Defendants or their affiliates, and the investigation into other Defendants or their affiliates in these cases as well as in CDS and

ISDAFIX remain ongoing. The below table sets forth the various regulatory fines that have been imposed against the same Defendants (or affiliates thereof) in this action.

| TABLE 7 | | | | | |
|---|---|---|---|---|---|
| Bank Family | LIBOR Fines | FX Fines | CDS Fines | ISDAFIX Fines | GICs Fines |
| Bank of America | TBD | $455,000,000 | TBD | TBD | $137,000,000 |
| Barclays | $453,600,000 | $2,318,000,000 | TBD | $115,000,000 | n/a |
| BNP Paribas | TBD | TBD | TBD | TBD | n/a |
| Citi | $95,000,000 | $2,285,000,000 | TBD | TBD | n/a |
| Credit Suisse | TBD | TBD | TBD | TBD | n/a |
| Deutsche Bank | $3,498,700,000 | TBD | TBD | TBD | n/a |
| Goldman Sachs | n/a | TBD | TBD | TBD | n/a |
| HSBC | TBD | $618,000,000 | TBD | TBD | n/a |
| J.P. Morgan | $108,400,000 | $1,904,000,000 | TBD | TBD | $228,000,000 |
| Morgan Stanley | n/a | TBD | TBD | TBD | TBD |
| Nomura | TBD | TBD | n/a | TBD | n/a |
| Société Générale | $604,700,000 | TBD | n/a | n/a | TBD |
| Rabobank | $1,066,000,000 | TBD | n/a | n/a | n/a |
| RBC | TBD | TBD | n/a | n/a | n/a |
| RBS | $1,142,600,000 | $1,303,000,000 | TBD | TBD | n/a |
| UBS | $1,523,000,000 | $1,483,000,000 | TBD | TBD | $160,000,000 |
| *SUB-TOTAL* | *$8,492,000,000* | *$10,366,000,000* | *TBD* | *$115,000,000* | *$525,000,000* |
| *TOTAL* | *$19,498,000,000* | | | | |

167.    A general overview of the Defendants' wrongdoing in each of the related financial markets is set forth below.

168.    The unique markets Defendants have admitted to collusively manipulating, and the manner in which the collusion was accomplished, are strikingly similar to Defendants' conduct in the Treasuries Market. Defendants' conspiracies have been aimed at markets in which they control the vast majority of all transactions. To facilitate these other conspiracies,

Defendants communicated with one another telephonically and electronically to share confidential order flow and client information. The same is true for Defendants' Treasuries Market conspiracy. Further, in each of these past cases, the conduct in question is facilitated by a small, close-knit group of traders, as is true in the instant case. "At this point, whatever the facts are regarding this, the government is in a strong position thinking that where there's smoke, there's fire," said Jill Fisch, a professor at University of Pennsylvania Law School. "It's not just one investigation after another, it's one scandal after another."

### 1. LIBOR

169.    Certain of the instant Defendants have already pled guilty and/or paid fines by government regulators for collusion of LIBOR, the most widely used interest rate benchmark in the world, in 2012. This was one of the first conspiracies in a series of shocking investigations that have revealed, over time, that the largest banks in the world have conspired to manipulate the most fundamental financial metrics in the economic international community.

170.    LIBOR is computed based on the banks' self-reporting of the cost at which they could borrow money in the London interbank market. Through various government settlements, including UBS pleading guilty to manipulation of LIBOR, the purpose and scope of the banks' conspiracy has been flushed out.

171.    Specifically, the banks colluded with one another to submit false rates that benefited individual trader positions and to appear healthier than they actually were. This caused the published LIBOR to be manipulated, which in turn caused investors in financial instruments linked to LIBOR to pay more or receive less than they otherwise would have in a competitive market.

172.    Government regulators have found that this conspiracy constituted price fixing in

violation of Section 1 of the Sherman Act.

173.    The banks accomplished this conspiracy through electronic and telephonic communications by a tightly-knit group of traders that agreed on the LIBOR quotes to be submitted on any given day. This was done both in direct bank-to-bank communication as well as facilitated through brokers.

### 2.    FX

174.    Defendants or their affiliates are also being investigated (or have already pled guilty and/or paid fines) by government regulators for violating federal antitrust laws by colluding to rig the $5.3 trillion-a-day FX market, the largest financial market in the world.

175.    Through the FX investigations, it has come to light that a group of traders at these banks met regularly in electronic chat rooms to swap confidential information, including details about their customers' orders, in order to collusively set key FX benchmark rates and to set artificially wide spreads on FX transactions. These traders dubbed their chat rooms (and each other) names such as "The Cartel," "The Mafia," and "One Team, One Dream." These traders developed coded language in order to avoid scrutiny by government regulators and Defendants' internal compliance departments.

176.    The banks were able to accomplish their conspiracy because, in part, the FX market is primarily conducted over-the-counter with little regulation and because the banks involved in the conspiracy are the dominant players in the market, having a market share of more than 90%.

177.    In the FX investigation, the DOJ has obtained guilty pleas and billions in fines from several Defendants thus far, including Barclays, Citi, JPMorgan, and RBS. In addition to the governmental fines, nine of the defendants in that case have agreed to pay U.S. investors more

than $2 billion in settlements.

### 3.    CDS

178.    Government regulators are similarly investigating certain Defendants' conduct with regards to CDS, which are contracts that transfer the credit exposure on a "reference entity" (*e.g.*, a bond issued by a governmental entity) or "reference portfolio" (*i.e.*, a bundle of reference entities) in exchange for periodic payments.

179.    In essence, a CDS is an insurance policy on an investment; if a "credit event" occurs (*e.g.*, default), the CDS buyer receives a lump sum payment, and investors frequently use CDS to hedge their investments in particular reference entities.

180.    The CDS conspiracy was aimed at creating and maintaining artificially wide bid/ask spreads for CDS. To that end, the banks colluded to keep CDS from moving to an exchange-based system, in which the bid/ask spreads would have narrowed considerably and the banks' customers would have received real-time pricing information.

181.    The banks accomplished this conspiracy by holding secret meetings in which they agreed to squash the potential competition through joint action.

182.    The banks were able to accomplish this collusion because, in part, (a) CDS are traded over-the-counter and is therefore a non-transparent market, and (b) the banks account for roughly 95% of CDS trading.

183.    In September 2015, it was announced that the bank defendants in CDS were finalizing a nearly $2 billion omnibus settlement with the plaintiffs in the civil class action litigation.

### 4.    ISDAFIX

184.    Government regulators are also investigating certain Defendants' collusive

manipulation of the ISDAFIX, a key benchmark interest rate for a number of important financial instruments, including interest rate swaps.

185.   The ISDAFIX was supposed to be set based on Defendants' transactions in the swaps market, in which Defendants competed with one another. However, the banks colluded with one another to manipulate the ISDAFIX by (a) sharing competitively sensitive information, including order flows, (b) coordinating the execution of a rapid-fire series of transactions immediately before the computation window (*i.e.*, "banging the close"), and (c) quoting the same spread—down to five decimal points—during the computation window.

186.   The banks were able to accomplish this collusion because, in part, (a) interest rate derivatives are traded over-the-counter in a non-transparent market, and (b) the banks control roughly 90% of the interest rate derivative market.

187.   This conspiracy was accomplished by traders using telephone calls, emails, and chat rooms to coordinate their activities.

188.   The CTFC has determined that traders at Barclays used Treasury Securities as part of their manipulative scheme to move reference rates and spreads that influence ISDAFIX.

189.   The ISDAFIX investigation remains ongoing against several primary dealers.

### 5.   GICs

190.   Government regulators, including DOJ, are investigating several banks for an illegal agreement and conspiracy to not compete and to rig bids for municipal derivatives sold to issuers of municipal bonds. GICs (Guaranteed Investment Contracts) are a type of municipal derivative.

191.   Specifically, the banks in the GICs investigation (together with their co-conspirators), through agreements not to compete and a conspiracy to rig bids, fixed/stabilized

the prices of municipal derivatives, including the interest rates paid to issuers on these instruments.

192.    For instance, the banks in GICs would frequently communicate their intended bids to one another and the bank designated to win a particular auction would only place its bid after being provided with the bids of its would-be-competitors. Similarly, the banks in GICs would compensate one another when a bank declined to submit a bid in a particular auction.

193.    The banks in GICs accomplished this conspiracy though mail, oral, and electronic communications. At times, the conspiracy was also facilitated through brokers, who would act as intermediaries between the colluding banks.

194.    The conspiracy was facilitated, in part, by the fact that the traders responsible for the bid rigging were located in close-proximity to one another (in Charlotte, North Carolina and New York, New York) and had developed strong relationships.

195.    In 2011, the DOJ extracted cooperation agreements and restitution payments from primary dealers, including JPMorgan Chase & Co. and UBS AG, and the related class action, which names several Defendants (or their parents and affiliates), including JPMorgan, Merrill Lynch, Morgan Stanley, and UBS, is ongoing in the District Court for the Southern District of New York.

## G.    Defendants Fraudulently Concealed Their Collusive Manipulation of the Treasuries Market

196.    During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion, as alleged herein, from Plaintiff and members of the Class.

197.    By its very nature, the unlawful activity alleged herein was self-concealing. Defendants conspired to artificially manipulate the prices of Treasury Securities and Treasury Derivatives to the benefit of Defendants and to the detriment of Plaintiff and members of the

Class, and they further conspired to keep their collusive and manipulative conduct secret. As a result and as described herein, Plaintiff could not, and thus did not, discover that it had suffered injury prior to Bloomberg's July 23, 2015 article.

198.   Defendants fraudulently concealed their anticompetitive activities by, among other things, engaging in secret communications in furtherance of their conspiracy. These communications occurred in non-public chat rooms, instant messages, and through email, none of which are or were reasonably available to Plaintiff or members of the Class.

199.   The chat rooms in question were operated by the highest-ranking traders within Defendants' operations, and Defendants strictly limited access to the chat rooms. The substance of the conversations occurring within these chat rooms was unknown to Plaintiff until May 20, 2015, at the earliest (when Barclays' ISDAFIX settlement disclosed that its traders were manipulating the price of Treasury Securities).

200.   For instance, while UBS apparently "barred its traders early last year from seeing client orders in the hours before an auction," UBS has never acknowledged this course of action nor is there publicly available information regarding this move.

201.   Defendants knew that they could not subject their collusive conduct to public scrutiny. In addition, Defendants actively and jointly concealed their collusive conduct. Defendants agreed among themselves not to publicly discuss or otherwise reveal the nature and substance of the acts and communications in furtherance of the agreements alleged herein.

202.   None of the facts or information available to Plaintiff, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracies alleged in this Complaint.

203.   As a result, Plaintiff was prevented from learning of the facts needed to commence

suit against Defendants for the manipulative and anticompetitive conduct alleged in this Complaint until Defendants and regulators publicly acknowledged their investigations.

204.   Reasonable due diligence could not have uncovered Defendants' conspiracy because the non-exchange, closed, and private nature of the trades helped to conceal Defendants' conduct:

   a)   The secondary market for Treasury Securities is a private, OTC market, and Defendants' trades and trading strategies are not public information; and

   b)   Defendants do not publish information concerning particular trading entities, including trading between dealer entities.

205.   To Plaintiff's knowledge, the first news report of possible manipulation in the Treasuries Market was published on June 8, 2015. Even that report was premised on an unannounced DOJ investigation.

206.   The facts necessary for Plaintiff to formulate the basis of a complaint and satisfy applicable pleading standards remained within the exclusive control of Defendants, their coconspirators, and the regulatory authorities investigating the activity alleged herein.

207.   Even after the Bloomberg article indicated possible manipulation in the Treasuries Market, Defendants did not address the allegations.

208.   Defendants' success in concealing their collusion was facilitated by their tremendous control over the global financial markets. Defendants wield substantial power over market participants. Market participants who suggest Defendants have engaged in anticompetitive behavior risk losing access to the Treasuries Market. It is thus unsurprising that the first reports of collusion came from the DOJ and not market participants.

209.    Because of Defendants' active steps, including fraudulent concealment of their conspiracy to prevent Plaintiff from suing them for the anticompetitive activities alleged in this Complaint, Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## CLAIMS FOR RELIEF

### COUNT ONE:
### VIOLATION OF 15 U.S.C. § 1
### AGREEMENT RESTRAINING TRADE

210.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

211.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. §§ 1, *et seq.*

212.    During the Class Period, Defendants entered into an agreement to reduce competition amongst themselves by fixing and/or manipulating Treasury Securities prices before and during Treasury auctions and, as a result, the prices of Treasury Derivatives.

213.    This conspiracy to manipulate prices of Treasury Securities and Treasuries Derivatives caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive prices and, thus, Plaintiff and the Class, upon execution of their trades, received less than they would have received absent Defendants' wrongful conduct.

214.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Treasury Securities and Treasury Derivatives markets. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is

outweighed by the anticompetitive effects of Defendants' conduct.

215.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

216.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein. Plaintiff and the Class are also entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

**COUNT TWO:**
**VIOLATION OF 7 U.S.C. §§ 1, *ET SEQ.***
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**INCLUDING CFTC RULE 180.2**

217.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

218.    By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(3) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2 adopted under the CEA ("Rule 180.2") and caused artificial change in the prices of Treasury Derivatives during the Class Period.

219.    Defendants and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of Treasury Derivatives in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.2.

220.    Defendants and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

221.    Plaintiff and others who transacted in Treasury Derivatives during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulation in violation of the CEA, 7 U.S.C. §§ 1, *et seq.*, and Rule 180.2 and, as a direct result

thereof, were injured and suffered damages. Plaintiff and each member of the Class sustained and are entitled to actual damages for the violations of the CEA alleged herein.

**COUNT THREE:**
**VIOLATION OF 7 U.S.C. §§ 1, *ET SEQ.***
**EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR**
**CONTRIVANCE IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**INCLUDING CFTC RULE 180.1**

222.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

223.    By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(1) and 9(a)(2) of the CEA, 7 U.S.C. §§ 9(1), 13(a)(2), and CFTC Rule 180.1 adopted under the CEA ("Rule 180.1") and caused prices of Treasury Securities and Treasury Derivatives to be artificial during the Class Period.

224.    Defendants and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of Treasury Securities and Treasury Derivatives in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.1.

225.    Defendants and their co-conspirators also caused false or misleading or inaccurate reports to be delivered in connection with the Treasury Department auctions by fixing the bids during these auctions, thereby causing them to reflect artificial, non-competitive pricing for these securities, in violation of CEA Section 6(c)(1), and CFTC Rule 180.1. Defendants and co-conspirators did so either knowingly, intentionally, or acting in reckless disregard of the fact that such reports were false, misleading or inaccurate. Defendants also violated CFTC Rule 180.1 by deceiving their customers in the when-issued market through the sale of price-fixed when-issued Treasury Securities.

226.    Customers in the when-issued market had a reasonable expectation that the prices of when-issued Treasury Securities are reflective of natural market forces. By selling price-fixed Treasury Securities to their unwitting customers, Defendants undermined their customers' reasonable expectations of a fair marketplace free from manipulation and collusion.

227.    Defendants and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

228.    Plaintiff and others who transacted in Treasury Securities and Treasury Derivatives during the Class Period transacted at artificial and unlawful prices resulting from Defendants and their co-conspirators' manipulations in violation of the CEA, 7 U.S.C. §§ 1, *et seq.*, and Rule 180.1 and, as a direct result thereof, were injured and suffered damages. Plaintiff and each member of the Class sustained and are entitled to actual damages for the violations of the CEA alleged herein.

**COUNT FOUR:**
**VIOLATION OF 7 U.S.C. §§ 1, *ET SEQ.***
**PRINCIPAL-AGENT LIABILITY IN VIOLATION OF**
**THE COMMODITY EXCHANGE ACT**

229.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

230.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

231.    Plaintiff and each member of the Class are entitled to actual damages for the violations of the CEA alleged herein.

### COUNT FIVE:
### VIOLATION OF 7 U.S.C. §§ 1, *ET SEQ.*
### AIDING AND ABETTING LIABILITY IN VIOLATION OF
### THE COMMODITY EXCHANGE ACT

232.    Plaintiff incorporates by reference and re-allege the preceding allegations as though fully set forth herein.

233.    Defendants and their co-conspirators knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's and their co-conspirators' manipulation of the Treasuries market and willfully intended to assist these manipulations, which resulted in artificial Treasury Securities and Treasury Derivatives pricing during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

234.    Plaintiff and each member of the Class are entitled to actual damages for the violations of the CEA alleged herein.

### COUNT SIX:
### UNJUST ENRICHMENT

235.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

236.    Defendants and their co-conspirators, through their unlawful conduct, as alleged herein, have been unjustly enriched at the expense of Plaintiff and the Class.

237.    It would violate established principles of equity and good conscience for Defendants to keep the profits they obtained through manipulating the market for Treasury Securities and Treasuries Derivatives.

238.    Plaintiff and the Class transacted in Treasury Securities directly with Defendants. By virtue of Defendants manipulation of these when-issued Treasury Securities, Plaintiff and the

Class were deprived the benefits of a fair market free from collusion and manipulation. As result of their unlawful misconduct, Defendants reaped millions of dollar in profits at the expense of Plaintiff and members of the Class.

239.    Furthermore, the Treasury Derivatives market is effectively a zero-sum game, meaning that when one individual gains money in a particular transaction, another must lose money on that same transaction. As a direct and foreseeable consequence of Defendants' manipulation of Treasury Securities and Treasury Derivatives, Defendants were able to reap millions of dollars in profits at the expense of Plaintiff and members of the Class.

240.    Accordingly, Plaintiff and the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein, by way of transactions for the sale or purchase of Treasury Securities and Treasury Derivatives entered into with Defendants or their co-conspirators.

## **PRAYER FOR RELIEF**

Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Federal Rules of Civil Procedure 23, designate Plaintiff as class representatives, and appoint Plaintiff's counsel as counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.    That Defendants be permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint and that the Court direct such other equitable relief as may be appropriate;

D.    That the Court award Plaintiff and the Class damages against Defendants for their

violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

      E.      That the Court find that Defendants violated the CEA and award appropriate damages;

      F.      That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

      G.      That the Court directs such further relief it may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of the Class identified herein, demands a trial by jury for all issues so triable.

Dated: October 15, 2015           Respectfully submitted,

                    */s/ Scott Martin*
                    Scott Martin
                    Irving Scher
                    HAUSFELD LLP
                    165 Broadway, Suite 2301
                    New York, NY 10006
                    Telephone: (646) 357-1195
                    Facsimile: (212) 202-4322
                    Email: smartin@hausfeld.com
                    Email: ischer@hausfeld.com

                    Michael D. Hausfeld
                    William P. Butterfield
                    HAUSFELD LLP
                    1700 K Street NW, Suite 650
                    Washington, DC 20006
                    Telephone: (202) 540-7200
                    Facsimile: (202) 540-7201
                    Email: mhausfeld@hausfeld.com
                    Email: wbutterfield@hausfeld.com

                    Michael P. Lehmann

Bonny E. Sweeney
Christopher L. Lebsock
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeld.com
Email: bsweeney@hausfeld.com
Email: clebsock@hausfeld.com

Gary I. Smith, Jr.
HAUSFELD LLP
325 Chestnut St., Suite 325
Philadelphia, PA 19106
Tele: (215) 985-3270
Fax: (215) 985-3271
Email: gsmith@hausfeld.com

Lesley E. Weaver
BLOCK & LEVITON LLP
520 Third Street, Suite 108
Oakland, CA 94607
Office: (415) 968-8999
Fax: (617) 507-6020
Email: lweaver@blockesq.com

*Attorneys for Plaintiff and the Proposed
Class*